IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE:<br><br>GRUPO HIMA SAN PABLO, INC.<br><br>    Debtor | CASE NO. 23-02510 (ESL)<br><br>CHAPTER |
| IN RE:<br><br>CENTRO MEDICO EL TURABO, INC.<br><br>    Debtor | CASE NO. 23-02513 (ESL)<br><br>CHAPTER 11 |
| IN RE:<br><br>HIMA SAN PABLO PROPERTIES, INC.<br><br>    Debtor | CASE NO. 23-02515 (ESL)<br><br>CHAPTER 11 |
| IN RE:<br><br>PORTAL DE CAGUAS, INC.<br><br>    Debtor | CASE NO. 23-02516 (ESL)<br><br>CHAPTER 11 |
| IN RE:<br><br>GENERAL CONTRACTING SERVICES, INC.<br><br>    Debtor | CASE NO. 23-02517 (ESL)<br><br>CHAPTER 11 |
| IN RE:<br><br>IA DEVELOPERS, CORP.<br><br>    Debtor | CASE NO. 23-02519 (ESL)<br><br>CHAPTER 11 |
| IN RE:<br><br>CMT DEVELOPMENT, LLC.<br><br>    Debtor | CASE NO. 23-02520 (ESL)<br><br>CHAPTER 11 |
| IN RE:<br><br>JOCAR ENTERPRISES, INC.<br><br>    Debtor | CASE NO. 23-02521 (ESL)<br><br>CHAPTER 11 |

IN RE:

JERUSALEM HOME AMBULANCE, INC.

    Debtor

IN RE:

HOST SECURITY SERVICES, INC.

    Debtor

CASE NO. 23-02522 (ESL)

CHAPTER 11

CASE NO. 23-02523 (ESL)

CHAPTER 11

### **OPINION AND ORDER**

On August 15, 2023, Grupo HIMA San Pablo, Inc. and its affiliated entities in the above captioned cases (collectively referred to as "Debtors" or "Grupo HIMA"), as debtors and debtors in possession (collectively the "Debtors") filed for bankruptcy protection under chapter 11 (the "Chapter 11 Cases"). Due to the urgency of the matter, the following motions[1] as to Debtors' request for post-petition DIP financing and the objections thereto are before the consideration of the Court in an expedited manner: the Debtors' *(i) Amended Urgent Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Post-Petition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection to Pre-Petition Secured Parties, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing and (VII) Granting Related Relief* (the "DIP and Cash Collateral Motion", dkt. #21), as supplemented and amended by the *Supplement / Amendment to DIP Financing and Consented Use of Cash Collateral at Docket No. 9 & 21* (dkt. #66); the Puerto Rico Fiscal Agency and Financial Advisory Authority's (referred to as "AAFAF") *Response and Preliminary Objection to Urgent Motion for Entry of*

---

[1] The referenced motions discussed herein have been filed in each of the captioned chapter 11 Cases. Reference, however, is made to the docket entries in the Lead Case No. 23-02510.

*Interim Order to Approve Post-Petition Debtor in Possession Financing and Related Relief* (dkt. #35) and *Informative Motion Reiterating Position of the Government Entities as to Urgent Motion for Entry of Interim Order to Approve Post-Petition Debtor in Possession Financing and Related Relief, as Supplemented* (dkt. #69); the Municipal Revenue Collection Center's (referred to by its Spanish acronym "CRIM") *Preliminary Objection to ECF 21: Debtor's Motion for Post-Petition Credit to Obtain Post Petition Financing to Use Cash Collateral and Other Remedies* (dkt. #33, 40) and *Preliminary Motion to Reiterate and Supplement CRIM's Objection Filed at ECF 40* (dkts. #68); and the U.S. Trustee for Region 21's *Objection to Debtor's Urgent Motion Requesting an Interim and Final Order: (a) Granting Authorization to Obtain Post-Petition Financing; (b) Authorization to Use Cash Collateral; (c) Granting Liens and Providing Super-Priority Administrative Expense Claims; (d) Granting Adequate Protection to Pre-Petition Secured Parties; (e) Modifying the Automatic Stay; and (f) Scheduling a Final Hearing and Granting Related Relief* (dkt. #70).

For the reasons stated herein, the Debtors' DIP and Cash Collateral Motion (dkt. #21), as supplemented and amended (dkt. #66) is hereby denied.

PERTINENT FACTUAL BACKGROUND AND POSITION OF OBJECTING PARTIES

On August 16, 2023, Grupo HIMA filed the DIP and Cash Collateral Motion (dkt. #21). On August 17, 2023, the CRIM filed a *Preliminary Objection to ECF 21: Debtor's Motion for Post-Petition Credit, to Obtain Post Petition Financing, to Use Cash Collateral and Other Remedies* (dkt. #33), objecting to the DIP and Cash Collateral Motion on the grounds that it "seeks to subordinate [CRIM's] first rank statutory lien under Section 364(d)(1) without providing or meeting the adequate protection requirements of such section, by merely stating that there exists a purported, but not proven, alleged equity cushion to protect CRIM's senior statutory lien" (id., p.1, ¶ 1); "[t]his is not a replacement lien on unencumbered property and does not preserve the

value of CRIM's claim as required under 11 U.S.C. § 361 (2) since the accruing priming liens will decrease the value of CRIM's interest in the real estate" (id.); CRIM's senior statutory lien will be erased in the event of foreclosure (id.); the priming of CRIM's lien is not necessary as an equity cushion exists per Exhibit C at ECF 9, and thus the priming of the lien is contrary to law and the Debtors are not offering adequate protection (id., p. 2, ¶ 3); the DIP and Cash Collateral Motion is tantamount to a *sub rosa* plan which will only benefit the post-petition lenders at the "expense of the public monies and public interest involved (id., p. 3, ¶ 5); no efforts were made by the Debtors to obtain DIP credit from lenders other than the lender at issue, in contravention of the mandatory requirements of 11 U.S.C § 364(d)(1)(A) (id., pp. 4-5, ¶ 8); and the proposed roll-up has a negative financial consequence on the "financially weak" Debtors by burdening the estate with "such a huge administrative claim and other burdensome requirements" (id., p. 5, ¶ 9).

On that same date, August 17, 2023, the AAFAF filed a *Response and Preliminary Objection to Urgent Motion for Entry of Interim Order to Approve Post-petition Debtor in possession Financing and Related Relief* (dkt. #35) averring that the Debtors received $62.9 million in federal aid during the COVID-19 pandemic, and objecting to the DIP and Cash Collateral Motion on the grounds that it appears to be an impermissible *sub rosa* plan; is neither fair, equitable, not appears to be the product of a fair and arm's length process on account of certain phrasing used by the Debtors, the proposed default interest rate, commitment fee to the lender of 10% of the DIP proceeds, rollups, cross-collateralization provisions, liens on avoidance actions, priming of CRIM's liens without CRIM's consent, releases to lenders, and waivers of 11 U.S.C. § 506(c) and 'equities of the case' exceptions; and does not satisfy the requirements of 11 U.S.C. § 364(d)(1)(A) for it does not demonstrate that the Debtors attempted to obtain alternative financing elsewhere, but were unable to do so, and that such requirements are not met by the averments raised in motion and accompanying declarations (id., p. 16, ¶ 20).

On that same date, August 17, 2023, the Debtors filed a *Motion for Emergency Authorization of (1) the Interim Use of Cash Collateral and in the Alternative an (2) Entry of an Emergency Scheduling Order Regarding for [sic] the Related Relief* (dkt. #39), supplemented by a *Motion for Supplement to Cash Collateral Motion with Declaration and Budget* (dkt. #42), and further supplemented by a *Supplement to Motion for Interim Use of Cash Collateral Until August 23, 2023, with Reduced Budget for Immediate Necessary Expenses with Attached Proposed Consent Order Agreed with First Lien Secured Lender with Proposal of Adequate Protection* (dkt. #45).

On August 18, 2023, the CRIM filed a *Preliminary Objection to ECF 21: Debtor's Motion for Post-Petition Credit, to Obtain Post Petition Financing, to Use Cash Collateral and Other Remedies* (dkt. #40), premised on the same grounds as in its prior motion (dkt. #33).

On that same date, August 18, 2023, Island Healthcare, LLC (referred to as "Island Healthcare" or "Senior Lender"), filed a *Preliminary Objection to Debtor's Requested for the Use of Cash Collateral and Demand for Adequate Protection* (dkt. #43), objecting to the Debtor's request for cash collateral absent entry of a DIP financing order, and averring that no equity cushion exists, and Debtors are unable to offer any additional liens as they have no unencumbered assets.

Although not specifically scheduled to be heard at the August 18, 2023, emergency hearing, the parties argued their respective positions as to the proposed DIP financing and limited use of cash collateral to sustain operations for a few days (dkts. #29 & 72). Debtors informed that, considering the matters discussed at the hearing, an amended request for authorization to use cash collateral would be filed because the debtors will be forced to close operations if the cash collateral request is not approved. On even date, the Debtors filed a *Supplement to Motion for Interim Use of Cash Collateral Until August 23, 2023, with Reduced Budget for Immediate Necessary Expenses with Attached Proposed Consent Order Agreed with First Lien Secured Lender with Proposal of Adequate Protection* (dkt. #45). The revised budget covers operating

expenses in the total amount of $3,908,000.00 which are allocated in the following manner: (i) $2,677,000 are allocated to salaries; (ii) $750,000.00 allocated for physicians' wages; (iii) $265,000.00 for medical supplies; and (iv) $150,000.00 for contract services. The use of the cash collateral monies will result in a dollar-for-dollar adequate protection claim for the benefit of the Senior Lender and results in the priming of an adequate protection lien for the amount of the cash collateral, which directly affects and diminishes CRIM's first ranked statutory lien. Notwithstanding, the Debtors contend that CRIM remains fully protected by remaining value of real estate (dkt. #45, p. 4, ¶13). On even date, the Court granted the Debtors' *Supplement to Motion for Interim Use of Cash Collateral Until August 23, 2023, with Reduced Budget for Immediate Necessary Expenses* (dkt. #47).

On August 20, 2023, the Debtors filed an urgent motion requesting the scheduling of a hearing for August 23, 2023, to consider the DIP Financing and use of cash collateral (dkt. #55). The request was granted on August 21, 2023, via an *Order Establishing Response Deadlines and Scheduling Hearings to Consider First Day Motions* (dkt. #59).

On that same date, August 21, 2023, the Debtors filed a *Supplement / Amendment to DIP Financing and Consented Use of Cash Collateral at Docket No. 9 & 21* (dkt. #66). On August 22, 2023, the CRIM filed a *Preliminary Motion to Reiterate and Supplement CRIM's Objection Filed at ECF40* (dkt. #68), averring that the proposed replacement liens and priority claims on certain of Debtors' accounts receivable and the "Molina Litigation" offered as adequate protection to CRIM do not meet the requirements of 11 U.S.C. §§ 361, 364(d)(1) as they do not place CRIM's statutory lien in the same senior position it had due to its unconsented subordination to Lender's claims; "there is simply no way to make a due diligence assessment to confirm the real possibility of collecting on the purported 'assets' being offered as adequate protection to CRIM" (id., p. 2, ¶ 3); and, Debtors' allegations concerning adequate protection for CRIM are "unverified and unproven" (id., p. 3, ¶ 5).

On that same date, August 22, 2023, the AAFAF filed an *Informative Motion Reiterating Position of the Government Entities and to Urgent Motion for Entry of Interim Order to Approve Postpetition Debtors in Possession Financing and Related Relief, as Supplemented* (dkt. #69) sustaining its earlier position. Also on August 22, 2023, the U.S. Trustee for Region 21 filed an *Objection []* (dkt. #70), objecting to the DIP and Cash Collateral Motion, as supplemented and amended, on the following grounds: creditors and parties in interest have been provided less than the 7-days to review Debtors' voluminous pleading; the interim request reads as a final order; the roll-up constitutes extraordinary relief that is unsupported by the caselaw proffered by the Debtors and "may create an undesirable precedent in future cases" (id., p. 6, ¶ 16); liens on avoidance actions and certain terms regarding the interim order's effect on third parties and yet-to-be-appointed-committees should be stricken; and, finally, to any relief that is "beyond what is strictly necessary to prevent immediate and irreparable harm" to the estate (id., p. 8, ¶ 24).

ISSUES

The key step in reviewing any DIP financing proposition is analyzing the financial information submitted in support of such request, including relevant documentation and necessary valuations that sustain any proposed DIP financing. Notwithstanding, the key legal issue that the Court will focus on at this juncture is whether the priming of CRIM's first rank statutory lien under the proposed DIP financing arrangement is appropriate under 11 U.S.C. § 364(d) since, at this juncture and with the limited financial information available, it appears that CRIM will be the only party directly affected by the priming of its statutory lien.

FINANCIAL OVERVIEW OF THE DEBTORS

The Court is cognizant that only nine (9) days have elapsed since the Debtors' bankruptcy petitions were filed. At the same time, due to the dire financial condition of the Debtors, these Chapter 11 Cases have progressed in an expedited manner which has afforded interested parties limited time to object to review all of the motions, as supplemented and/or amended, and any

objections thereto, that have been filed regarding the Debtors' request for authorization of DIP financing. At this juncture, the Debtors have not filed Schedules nor a Statement of Financial Affairs. As such, the financial condition of the Debtors is difficult to ascertain due to a lack of key financial information and/or disclosures.

The Debtors have informed that they have outstanding debt obligations of $248 million, which amount consist of (i) approximately $162 million of principal amount of pre-petition first lien loan owed to the Senior Lender and (ii) approximately $86 million of principal amount of pre-petition second lien loan owed to an undisclosed lender of which Wilmington Trust is the collateral and administrative agent. These loans have been in default since the year 2018 and 2016 respectively (dkt. #21, p. 18). Mr. Armando J. Rodríguez ("Mr. Rodríguez"), Debtors' principal, in his declaration disclosed that as of December 31, 2022, the Debtors had no less than $390.1 million of secured debt obligations (dkt. #9-9). Mr. Rodriguez's declaration also disclosed that the Debtors have the following unsecured debts which amount in total to approximately $212.58 million and which are itemized as follows: (i) salaries in the amount of $3,110,689; (ii) Suppliers in the amount of $55,213,677; (iii) Health Providers in the amount of $21,579,062; (iv) the Puerto Rico Treasury Department for unemployment withholdings in the amount of $11,783,436; (v) the Puerto Rico Treasury Department for employee and contractor withholdings in the amount of $36,320,341; (vi) the Internal Revenue Service for FICA withholdings; (vii) the Internal Revenue Service for FUTA withholdings in the amount of $26,424; (viii) the Aqueduct and Sewer Authority in the amount of $5,989,744; (ix) LUMA energy in the amount of $49,655,481; and (x) the State Insurance Fund in the amount of $15,303,547 (dkt. #9-9, p. 10).

The Debtors have submitted information as to primarily the real estate assets of the Debtors which consist of 78 real estate properties, which appear to be related to the hospitals as they include offices, hospital buildings, ambulatory buildings, parking lots, food courts, and medical storage

areas. Amongst the properties listed that do not appear to be related to the hospital operations is certain land in Virginia, land in the municipality of Humacao, and an apartment in Beach Village also in Humacao (dkt. #66-3). The Debtors have also furnished a barebones adequate protection analysis which is primarily based upon four (4) 2019 appraisals and one (1) 2022 appraisal with the following fair market values for four (4) hospitals and (1) ambulatory center: (i) HIMA San Pablo Fajardo with a real property value of $14 million and a private offer received of $7 million; (ii) HIMA San Pablo Humacao (2022 Appraisal) with a real property value of $2.3 million; (iii) HIMA San Pablo Bayamón with a real property value of $100.5 million; (iv) HIMA San Pablo Caguas with a real property value of $111.5 million; and (v) a HSP Ambulatory Center Caguas with a real property value of $4.8 million (dkt. #9-8). The Court notes that the aggregate fair market value of these real estate properties amount to $233.1 which is less than the summation of the principal amounts owed to the Senior Lender ($162 million) and to the second lien holder ($86 million).  The Court further notes that neither the referenced 2019 appraisal nor recent appraisals have not been submitted, and is cognizant that the fair market value of these hospitals will differ if the hospitals are sold as a going concern or as part of a Chapter 7 liquidation scenario in which the hospitals have 'gone dark' and ceased operating. The Debtors have disclosed that the 78 properties in the aggregate all have a first ranked lien for real property taxes (CRIM) in the amount of approximately $11.5 million. At the August 18, 2023, hearing, Island Healthcare informed the Court that hospitals are generally exempted from the payment of real property taxes, but the Debtors lost such exemption upon failing to pay their tax obligations to the Puerto Rico Treasury Department (dkt. #72).

The Debtors have disclosed that they have $93.2 million in accounts receivables and there is an estimated bad debt reserve of $42.3 million that based on historical data will most likely not be collected, leaving approximately $50.9 million in collectible accounts receivables. Moreover,

$73.87 million of the accounts receivables which constitutes 79.2% of the totality receivables have been outstanding for more than ninety (90) days. (dkt. #66-4). Mr. Rodríguez testified that these receivables do not include the receivables related to the "Molina Litigation." It is important to note that Island Healthcare avers that these pre-petition accounts receivables constitute its cash collateral, and the Debtors admit to the same. Moreover, at the August 18, 2023, hearing, the Senior Lender informed the Court that its senior secured debt is currently under secured and that interest payments have not been made on this secured loan for the last five (5) years. The Court notes that the Debtors have not made interest payments on its secured debt for approximately five (5) years and that the total amounts owed with accrued interest, fees, costs, and expenses —including any attorneys', financial advisors', and other professionals' fees and expenses that are chargeable or reimbursable under the pre-petition first lien credit agreement and all other obligations as defined in the pre-petition first lien credit agreement (dkt. #43, pgs. 9-10, ¶25))— to the Senior Lender and the junior lien holder have not been disclosed.

THE DIP FINANCING

The Debtors' request post-petition financing from its Senior Lender up to $6 million, of which $4 million would be provided upon the entry of an interim DIP financing order, with the remainder $2 million to be provided upon the entry of a final order. The Debtors' DIP and Cash Collateral Motion, as supplement and amended, disclose that such financing will be subject to certain terms and conditions, including: (i) a superpriority and senior priming lien over all of the Debtors' real estate and personal pre-petition and post-petition property pursuant to 11 U.S.C. §364(d), which includes priming CRIM's statutory lien of approximately $11.5 million based on the Debtors' calculations (Dkt. #66-3); (ii) a superpriority administrative expense claim pursuant to Section 364(c)(1) which shall be senior to Section 507(b) claims and senior to all other administrative expenses and unsecured claims; (iii) and a 5:1 roll-up which would grant

superpriority liens to the $6 million DIP loan, plus a $600,000 commitment fee and the pre-petition first lien obligations for a total of $39.6 million of superpriority loans; (iv) the Senior Lender would be entitled to all of the rights and benefits of 11 U.S.C. § 552(b); and (v) subject to the entry of the Final Order, the DIP secured parties and the pre-petition secured parties will receive liens on the proceeds of avoidance actions under Chapter 5 of the Bankruptcy Code. Both the proposed interim and final orders are bound by the 5:1 roll-up superpriority lien condition.

In the Debtors' *Supplement / Amendment to DIP Financing and Consented Use of Cash Collateral*, the Debtors (with the consent of the Senior Lender) propose to provide CRIM with the following adequate protection: (i) as security for the payment of the CRIM adequate protection obligations a valid, perfected replacement security interest in and lien on the proceeds of both (1) all accounts receivable of each of the Debtors and (2) the Molina Litigation subject and subordinate only to (i) the carve-out and (ii) DIP liens; and (ii) an allowed superpriority claim against the Debtors as provided in 11 U.S.C. §507(b) in the amount of the CRIM section 507(b) claims and solely with respect to the proceeds (1) the Debtors' account receivables and (2) the Molina Litigation with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to the Bankruptcy Code provision, subject and subordinate only to (a) the carve-out and (ii) the DIP superpriority claims granted with respect to the DIP Obligations. The CRIM shall not receive or retain any payments, property, or other amounts with respect to the CRIM 507(b) claims unless and until the carve-out is funded and all the DIP Obligations have been indefeasibly paid in full cash. (dkt. #66, pp.4-5).

The Debtors argue that CRIM will be adequately protected even though its adequate protection is subordinate to the DIP Obligations because the amount of the collectable accounts receivable plus the proceeds of the Molina Litigation far exceed both the Senior Lender's senior lien and CRIM's adequate protection lien. Moreover, the Debtors further argue that without any

-11-

unencumbered assets, the Debtors will be unable to access another post-petition financing without a priming fight and the Debtors would be unable to provide adequate protection to any other entity on such a hypothetical loan. Island Healthcare's position is that it will not provide financing to the Debtors without the 5:1 roll-up due to the substantial risks related to the Debtors' dire financial condition and lack of cash to fund its most basic operational expenses.

APPLICABLE LAW & ANALYSIS

Debtor-in-possession financing is oftentimes crucial to a Chapter 11 debtor in financial distress for it provides much needed cash during the reorganization process. Due to the high risk of lending monies to a distressed debtor in bankruptcy, DIP lenders require special security of their interests, such as the priming of a first priority lien. A DIP financing may be approved if a debtor is unable to obtain other financing and the interests of preexisting lienholders will be adequately protected pursuant to 11 U.S.C. §364(d).

Section 364(d) provides: "(1) [t]he court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if – (A) the trustee is unable to obtain such credit otherwise; and (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection." 11 U.S.C. § 364(d). Thus, under Section 364(d), the trustee or DIP has the burden of proof on the issue of adequate protection.

"The ability to prime an existing lien is extraordinary, and in addition to the requirement that the trustee be unable to otherwise obtain the credit, the trustee must provide adequate protection for the interest of the holder of the existing lien or obtain such lien holder's consent." Richard Levin & Henry J. Sommer, 3 <u>Collier on Bankruptcy</u>, ¶364.05[1] (16th ed. 2023).

"However, granting post-petition financing on a priming basis is extraordinary and is allowed only as a last resort." In re YL W. 87th Holdings I LLC, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010). The purpose and/or focus of adequate protection for a secured creditor is simply to protect the secured creditor from a diminution in the value of its collateral during the reorganization process. "Further, priming is impermissible unless there is adequate protection to existing lien holders." Id. at 441, citing In re First South Sav., 820 F. 2d 700, 701-11 (5th Cir. 1987).

Adequate protection is not a defined term in the Bankruptcy Code. However, Section 361[2] provides a nonexclusive list of the different forms that constitute adequate protection under certain statutes of the Bankruptcy Code. "The whole purpose in providing adequate protection for a creditor is to ensure that the creditor receives the value for which the creditor bargained prebankruptcy. In determining these values, the courts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis. Since 'value' is the linchpin of adequate protection, and since value is a function of many factual variables, it logically follows that adequate protection is a question of fact." In re O'Connor, 808 F. 2d 1393, 1396-1397 (10th Cir. 1987) (citations omitted).

---

[2] Section 361 provides:

> When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—
> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
> (3) granting such other relied, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. §361.

The analysis of whether there is sufficient adequate protection to adequately protect a secured lender is basically tantamount to a collateral valuation issue which focuses on an equity cushion or a replacement lien which protects the secured creditor's interest. Most importantly, the adequate protection analysis must be based "… on facts or on projections grounded on a firm evidentiary basis." In re Mosello, 195 B.R. 277, 292 (Bankr. S.D.N.Y. 1996). See also In re First South Savings Association, 820 F. 2d 700, 712 (5th Cir. 1987) (the proposed post-petition financing should be denied where "[t]he numbers (i.e., value, income) offered by those called by the debtor to testify were… based on assumptions that are not supported by the record."); In re Packard Square, LLC, 574 B.R. 107, 120,114 (Bankr. E.D. Mich. 2017) (noting that "[a]s part of its burden of proving adequate protection, the Debtor has the burden of proof regarding the amount of liens against the property", finding debtor's appraisal evidence in support of request for DIP financing unpersuasive, and holding that debtor failed to meet its burden).

The adequate protection analysis as discussed by commentators Levin and Sommer is the following:

> "If there is little or no equity in the subject property, an equity cushion or potential increase in value might not protect the existing lender's interest, but the trustee may be able to provide a replacement lien for the original lender, if the estate has unencumbered property. However, if the trustee is offering a replacement lien to the original lender, it is reasonable to inquire why the new lender could not accept the replacement collateral instead of priming the existing lien. Therefore, it is more common to prime an existing lien only when the property has sufficient value to adequately secure both lenders' claims. Whether the existing lender's interest is adequately protected by a sufficient equity cushion turns on the valuation of the collateral, the method for which may take into account the intended disposition of the collateral."

Richard Levin & Henry J. Sommer, 3 Collier on Bankruptcy, ¶364.05[1] (16th ed. 2023).

Other courts have adopted a more "holistic approach" in which all pertinent facts are analyzed with a focus on whether value of the collateral will increase or decrease over time in conjunction with the reorganization of the debtor and the debtor's performance in the plan. See

-14-

In re Tashjian, 72 B.R. 968, 973 (Bankr. E.D. Pa. 1987; In re Aqua, 123 B.R. 192, 196-197 (Bankr. E.D. Pa. 1991); In re Olde Prairie Block Owner, LLC, 2011 Bankr. Lexis 1650, *21-22 (Bankr. N.D. Ill. 2011) ("As pointed out in an earlier opinion in this bankruptcy case, an equity cushion is not a debtor's piggy bank. When a debtor seeks to prime an existing creditor, it must also show that the creditor's interest is not being jeopardized, considering all of the relevant facts, with a particular focus upon the value of the collateral, the likelihood that it will depreciate or appreciate over time, the prospects for successful reorganization of the Debtor's affairs by means of the Plan, and the Debtor's performance in accordance with the Plan.") (internal quotations omitted).

A debtor's use of the credit obtained through a priming lien should be more likely than not to benefit the estate and improve the debtor's ability to reorganize. Id., citing In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992). However, speculative benefit should not be relied on for adequate protection. In re Mosello, 195 B.R. 277 (Bankr. S.D.N.Y. 1996). "When the effect of the new borrowing from a senior lender is merely to pass the risk of loss to the holder of the prepetition lien, the request for authorization should be denied absent the lien holder's consent. The authorization to prime an existing lien should not be read as authorization to increase substantially the risk of the prepetition lender in order to provide additional protection for a new, postpetition lender." Richard Levin & Henry J. Sommer, 3 Collier on Bankruptcy, ¶364.05[1]. See also In re Stoney Creek Techs., LLC, 364 B.R. 882, 892-893 (Bankr. E.D. Pa. 2007) (concluding that "[debtor] cannot operate profitably, will default on its obligations to Lender[s] will be impaired by its second lien position from realizing the value of its collateral. The DIP Loan is a stopgap measure that will not restore Debtor to economic health before it becomes due, if at all." And, "where potential and imminent default is as apparent as it is here and the priming lender has so tied the hands of the existing lender as

-15-

to render it unable to act, a different situation obtains. The terms of the Proposed DIP Order negate rather than confer adequate protection on M & B."); In re Windsor Hotel, L.L.C., 295 B.R. 307, 314, 50 Collier Bankr.Cas.2d 836 (Bankr. C.D. Ill. 2003) (denying motion for post-petition financing, noting that "[t]he authorization to prime an existing lien should not be read as authorization to increase substantially the risk of the existing lender in order to provide security for a new, post-petition lender. When the effect of the new borrowing with a senior lien is merely to pass the risk of loss to the holder of the existing lien, the request for authorization should be denied.").

Courts must also exercise caution not to authorize DIP financing terms to enable the payment of prepetition debt without compliance with plan confirmation requirements. Richard Levin & Henry J. Sommer, 3 Collier on Bankruptcy, ¶364.05[2]. See also In re Laffite's Harbor Dev. I, LP, 2018 Bankr. Lexis 2, at *6-7 (Bankr. E.D. Tex. 2018) (explaining that "[t]he bankruptcy court cannot, under the guise of Section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements," and refusing to approve postpetition financing where "[w]here the size of the proposed transaction in relation to all estimated of value of the [estate] property is sufficiently large that the proposed priming lien amounts to a sub rosa plan"); In re Berry Good, LLC, 400 B.R. 741, 746-48 (Bankr. D. Ariz. 2008) (holding that it was "not appropriate" to use the proceeds of a postpetition loan to pay the lender's prepetition debt in the absence of a confirmed plan).

In the instant case, the Court finds that the Debtors have not satisfied their burden pursuant to Section 364(d)(2) as to establishing that CRIM's first ranked statutory lien is adequately protected with the proposed priming of its lien and the replacement lien on the Debtors' accounts receivable which is junior to the DIP financing with the 5:1 roll-up but junior to the Senior Lender's pre-petition lien. The Debtors have failed to satisfy its burden because its

adequate protection analysis lacks crucial factual financial information on both the asset and liability side of the balance sheet. Among the crucial and missing crucial factual financial information are the total and final amounts of the prepetition debt inclusive of interest, fees, costs, expenses owed to the Senior Lender and to the junior lienholder. The Court has not been provided with this crucial piece of financial information. There are no updated real estate appraisals that provide the necessary fair market value determinations considering selling these assets under both a going concern and a liquidation analysis under Chapter 7 scenario. In addition, the accounts receivables aging report includes $73.87 million of the accounts receivables as outstanding for more than ninety (90) days without providing more detail as to the aging of these receivables which affects collectability. For example, there could be receivables that are 95 days outstanding, and some could be 180 days outstanding. No information was provided as to the Debtors' accounts receivables write-off policy after being outstanding for a specific number of days in conjunction with other factors that management may consider in ascertaining a more accurate number as to the actual accounts receivables that will eventually be collected. The Court is aware that it is the Senior Lender position that it is under secured and the Debtors agree with this statement. However, this Court has not been presented with the evidence to support this conclusion or the total amount of the secured liens encumbering the Debtors' properties. Moreover, CRIM's statutory first rank lien has already been primed by the $3.9 million afforded to the Senior Lender as adequate protection for the use of its cash collateral.

## CONCLUSION

For the reasons stated herein, the Debtors' DIP and Cash Collateral Motion (dkt. #21), as supplemented and amended (dkt. #66) is hereby denied.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 24th day of August 2023.

Enrique S. Lamoutte
United States Bankruptcy Judge